# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 16, 2007         Decided June 15, 2007

No. 05-1188

PUBLIC CITIZEN, INC., ET AL.,
PETITIONERS

v.

NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION,
ET AL.,
RESPONDENTS

ALLIANCE OF AUTOMOBILE MANUFACTURERS,
INTERVENOR

———

Consolidated with
05-1265, 05-1294, 05-1309, 05-1391

———

On Petitions for Review of Orders of the
United States Department of Transportation

———

*Marc D. Machlin* argued the cause for petitioners. With
him on the briefs were *Charles H. Carpenter*, *Peter H. Gunst*,
*Brian Wolfman*, and *Allison M. Zieve*. *Christopher J. Huber*
entered an appearance.

*H. Thomas Byron, III*, Attorney, U.S. Department of

Justice, argued the cause for respondents. With him on the brief were *Peter D. Keisler*, Assistant Attorney General, *Douglas N. Letter*, Attorney, *Paul M. Geier*, Assistant General Counsel, National Highway Traffic Safety Administration, and *Lloyd S. Guerci*, Assistant Chief Counsel.

*Erika Z. Jones* argued the cause for intervenor Alliance of Automobile Manufacturers in support of respondents. With her on the brief were *Adam C. Sloane*, *John T. Whatley*, and *Nancy Elizabeth Bell*.

Before: SENTELLE, RANDOLPH and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, in which *Circuit Judge* RANDOLPH joins.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* SENTELLE.

KAVANAUGH, *Circuit Judge*: In a hurry as they tend to the responsibilities of work and family, many American drivers do not regularly check the tire pressure on their cars. This can cause problems for the drivers and their passengers – and for others on the road – because driving a car with severely under-inflated tires increases the risk of serious accidents. After a series of accidents and deaths caused by tire blowouts in the late 1990s, Congress decided to make it easier for drivers to maintain adequate tire pressure. Congress enacted the Transportation Recall Enhancement, Accountability, and Documentation Act, known as the TREAD Act. This legislation required the Secretary of Transportation to "complete a rulemaking for a regulation to require a warning system in new motor vehicles to indicate to the operator when a tire is significantly under inflated." Pub.

L. No. 106-414, § 13, 114 Stat. 1800, 1806 (2000).

After notice-and-comment rulemaking, the Secretary of Transportation, acting through the National Highway Transportation Safety Administration, adopted Federal Motor Vehicle Safety Standard 138.  *See* 49 C.F.R. § 571.138.  The new standard requires automakers to include an automatic tire pressure monitoring system that turns on a warning light when tire pressure falls below a pre-determined level.  *See* Tire Pressure Monitoring Systems, 70 Fed. Reg. 18,136, 18,136-37 (Apr. 8, 2005).  The requirement is being phased in; most cars now being manufactured must meet the new standard, and nearly all cars manufactured after September 2007 must meet it.  *See id.* at 18,189.

Automakers have accepted the new standard without court challenge.  But the 130,000-member organization Public Citizen, four major tiremakers, and the Tire Industry Association (which includes tire manufacturers and retailers) have petitioned for review, arguing that the rule does not meet statutory requirements.  The key initial question for us is petitioners' standing under Article III of the Constitution.  The tire industry petitioners' theory of how Standard 138 might cause them harm is far too attenuated, and we conclude that they lack standing.  For its part, Public Citizen seeks to establish standing based on an alleged increased risk of harm to its members who drive or ride in cars.  As we will explain, we must seek supplemental submissions to determine whether Public Citizen has standing.

I

Federal highway safety laws aim to "reduce traffic accidents and deaths and injuries" to persons "resulting from traffic accidents."  49 U.S.C. § 30101.  To meet this goal, the

Secretary of Transportation is authorized to prescribe motor vehicle safety standards. *Id.* § 30111(a). As to tires, the relevant federal statute requires that automakers install tires capable of supporting the vehicle when it is loaded with a reasonable amount of luggage and the maximum number of passengers the vehicle is designed to carry. *See id.* § 30123(c). Under the Secretary of Transportation's Safety Standard 110, which governs tire selection, automakers must print the recommended tire inflation pressure on a placard, often visible in the driver's side door jamb; this is called the "placard pressure." *See* 49 C.F.R. § 571.110, S4.3.

In August 2000, Firestone (a predecessor of petitioner Bridgestone/Firestone North American Tire) began recalling 14.4 million tires because of numerous complaints of tire failure and resulting accidents on Ford sport utility vehicles equipped with Firestone tires. In the aftermath of that headline-grabbing recall, Congress enacted and President Clinton signed the Transportation Recall Enhancement, Accountability, and Documentation (TREAD) Act. Pub. L. No. 106-414, 114 Stat. 1800 (2000). The TREAD Act imposed new requirements governing tire safety. In particular, Section 13 of the TREAD Act instructed the Secretary to "complete a rulemaking for a regulation to require a warning system in new motor vehicles to indicate to the operator when a tire is significantly under inflated." *Id.* § 13, 114 Stat. at 1806.

The Secretary, acting through the National Highway Traffic Safety Administration, published a proposed rule implementing the TREAD Act directive. *See* Tire Pressure Monitoring Systems, 66 Fed. Reg. 38,982, 38,982-83 (proposed July 26, 2001). NHTSA set forth evidence that driving on severely under-inflated tires – that is, tires insufficiently inflated to bear the load placed on them – can

result in a number of serious consequences. An under-inflated tire heats up when the car is driven, and heat weakens tires, raising the risk of tire failure. *See id.* at 38,985-86. In addition to contributing to tire blowouts, under-inflated tires play a role in various kinds of crashes, including those caused by "an increase in stopping distance; skidding and/or a loss of control of the vehicle in a curve or in a lane change maneuver; or hydroplaning on a wet surface." *Id.* at 38,986. Moreover, under-inflated tires do not last as long as those driven at adequate pressures, and cars with under-inflated tires burn more fuel than cars with correctly inflated tires. *Id.*

After receiving comments, NHTSA published a final rule in 2002. *See* Tire Pressure Monitoring Systems, 67 Fed. Reg. 38,704, 38,704-05 (June 5, 2002). Public Citizen sought review in the United States Court of Appeals for the Second Circuit, which vacated the rule as inconsistent with the TREAD Act and the Administrative Procedure Act. *See Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39, 42, 62 (2d Cir. 2003). On remand, NHTSA sought comments on a new version of the rule. *See* Tire Pressure Monitoring Systems, 69 Fed. Reg. 55,896, 55,896-97 (proposed Sept. 16, 2004). On April 8, 2005, NHTSA published the final rule establishing Federal Motor Vehicle Safety Standard No. 138. Tire Pressure Monitoring Systems, 70 Fed. Reg. 18,136, 18,136, *reconsideration granted in part*, 70 Fed. Reg. 53,079 (Sept. 7, 2005).

Standard 138 requires automakers to install tire pressure monitors that can detect when the pressure in one or more of the vehicle's tires is (i) 25 percent or more below placard pressure or (ii) 20 psi or less, for most cars. *See id.* at 18,143. Under Standard 138, the tire pressure monitor must cause the dashboard warning light to turn on within 20 minutes after a tire becomes significantly under-inflated (that is, after a tire

reaches the warning threshold). *See id.* at 18,147-48. The light stays on until the driver corrects the tire pressure.

The manufacturer must certify that the monitor works for the vehicle's first tire set, but not for replacement tires. When the car is fitted with replacement tires for which the monitor cannot detect under-inflation, the monitor must trigger a malfunction light (distinct from the light indicating significant under-inflation) that does not switch off unless the driver installs compatible tires. *See id.* at 18,160. NHTSA estimated that, at "the high end," as many as 10 percent of all replacement tires may be incompatible with existing monitors. OFFICE OF REGULATORY ANALYSIS & EVALUATION, U.S. DEP'T OF TRANSP., FINAL REGULATORY IMPACT ANALYSIS: TIRE PRESSURE MONITORING SYSTEM FMVSS NO. 138, at II-10 to II-11 (2005).

Standard 138 also requires automakers to include an owner's manual statement highlighting the presence and function of the tire pressure monitor. 70 Fed. Reg. at 18,164-66. In addition, the owner's manual must inform the driver that each tire "should be checked monthly when cold" and should be inflated to the placard pressure; the manual also must note the dangers of driving on significantly under-inflated tires. *Id.* at 18,166.

The monitor requirement applies to so-called new light vehicles – those weighing 10,000 pounds or less, including passenger cars, sport utility vehicles, and light trucks – which for convenience we refer to simply as "cars." *See id.* at 18,136-37. NHTSA began phasing in the standard as of October 2005, and all cars manufactured after September 1, 2007 – subject to narrow exceptions – must comply with the standard's requirements. *See* Federal Motor Vehicle Safety Standards, 70 Fed. Reg. 53,079, 53,097 (Sept. 7, 2005).

The members of the Rubber Manufacturers Association include the four individual tiremakers that are petitioners in this case. During the rulemaking for Standard 138, that Association filed a petition for rulemaking to amend a separate standard, Standard 110. Standard 110 governs the car manufacturer's recommended tire pressure – the so-called placard pressure. The Rubber Manufacturers Association urged NHTSA to require automakers to set placard pressure high enough so that even if tire pressure falls to 25 percent below placard (triggering the monitor warning under Standard 138), the remaining pressure would be sufficient to support the vehicle's maximum load. This is known as a "tire pressure reserve." Under this approach, for example, if a tire's maximum-load-supporting pressure is 30 psi, the placard pressure would be 40 psi, so that a decline of 25 percent (10 psi) would still leave enough pressure to carry maximum load. Thus, *any* drop below the maximum-load-supporting pressure would make a tire "significantly under inflated" within the TREAD Act's meaning, and require the warning light to turn on. (The Tire Industry Association, whose members include manufacturers and retailers of new and replacement tires, essentially advanced the same interpretation of significant under-inflation in comments on Standard 138. *See* 70 Fed. Reg. at 18,161.)

NHTSA denied the rulemaking petition concerning Standard 110. Federal Motor Vehicle Safety Standards, 70 Fed. Reg. 28,888, 28,888-89 (May 19, 2005). "Agency data," NHTSA explained, "suggest that the presence or absence of a tire pressure reserve has little bearing on tire failures." *Id.* at 28,889. NHTSA estimated the effects "if all new vehicles were required to be fitted with tires that had, at a minimum, 8 psi of pressure reserve." *Id.* at 28,895. It calculated an annual benefit of about a two percent reduction in tire failures, leading at most to annual "prevention of 731 crashes (with

roughly $2 million in property damage and travel delay savings), 4 fatalities, and 96 injuries in all cases involving blowouts or flat tires." *Id.*; *see* OFFICE OF REGULATORY ANALYSIS & EVALUATION, U.S. DEP'T OF TRANSP., AN ANALYSIS OF TIRE RESERVE LOAD FMVSS 110, at 4-5 (2005). But NHTSA recognized that even those figures overstated the benefits by some unknown quantity – because no tire pressure reserve could prevent all blowouts, such as those caused by roadside nails, shattered glass, or other debris. On the cost side of the ledger, NHTSA concluded that the tire industry proposal would force automakers to select larger tires, "thereby triggering production changes and associated cost increases." 70 Fed. Reg. at 28,895. NHTSA stated that those costs would fall on "the automotive industry and consumers," and "could amount to approximately $132 million per year." *Id.*

Public Citizen, the Tire Industry Association, and four individual tiremakers (The Goodyear Tire & Rubber Co., Bridgestone/Firestone North American Tire, Cooper Tire & Rubber Co., and Pirelli Tire, who are all also members of the Rubber Manufacturers Association) filed petitions for review of Standard 138 in this Court. They challenge: (i) the 25-percent-below-placard-pressure standard for significant under-inflation; (ii) the absence of a requirement that monitors be capable of detecting significant under-inflation in replacement tires; (iii) the 20-minute delay between significant under-inflation and warning light activation; and (iv) the way the agency required the monitors be tested before use (which, petitioners contend, does not reflect real-world driving hazards such as wet roads). The Tire Industry Association and the tiremakers also filed a petition for review of NHTSA's denial of the rulemaking petition concerning Standard 110. We consolidated all of the petitions.

9

II

We first determine whether we have subject-matter jurisdiction to directly review the tire industry petitioners' challenge to NHTSA's refusal to initiate a rulemaking to amend Standard 110. As we have explained: "Because district courts have general federal question jurisdiction under 28 U.S.C. § 1331, the normal default rule is that persons seeking review of agency action go first to district court rather than to a court of appeals. Initial review [of agency decisions] occurs at the appellate level only when a direct-review statute specifically gives the court of appeals subject-matter jurisdiction to directly review agency action." *Watts v. SEC*, 482 F.3d 501, 505 (D.C. Cir. 2007) (internal quotation marks and citations omitted).

The tire industry petitioners point to 49 U.S.C. § 30161(a) as such a direct-review statute for NHTSA decisions. The statute provides that a "person adversely affected by an order *prescribing* a motor vehicle safety standard" may seek direct review in the court of appeals "for the circuit in which the person resides or has its principal place of business." 49 U.S.C. § 30161(a) (emphasis added).

Here, that statute would authorize direct review in this Court only if NHTSA's denial of a petition for rulemaking to amend a safety standard were considered an order "prescribing" such a safety standard. In ordinary English, however, to "prescribe" is to order or adopt something as a governing rule. *See, e.g.*, 12 OXFORD ENGLISH DICTIONARY 390 (2d ed. 1989) (defining "prescribe" as "[t]o write or lay down as a rule or direction to be followed" or "to dictate, appoint, direct"). When NHTSA promulgates a safety standard such as Standard 138, it obviously "prescribes" that standard. But when NHTSA merely declines to amend an

existing standard such as Standard 110, NHTSA does not "prescribe" a standard. Moreover, as the Secretary points out, the section of the statute providing for petitions to initiate NHTSA rulemakings underscores the distinction between an order prescribing a safety standard on the one hand and an order denying a petition for rulemaking on the other. That section provides: "Any interested person may file a petition with the Secretary of Transportation requesting the Secretary to begin a proceeding . . . to prescribe a motor vehicle safety standard . . . ." 49 U.S.C. § 30162(a)(1). Denying a "petition . . . requesting the Secretary to begin a proceeding" under Section 30162 is not synonymous with prescribing a safety standard under Section 30161(a). Therefore, the plain terms of the statute dictate that judicial review of NHTSA's denial of a petition for rulemaking must begin in district courts – not in courts of appeals. *See, e.g.*, *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004).

The tire industry petitioners nevertheless advance three arguments why we should disregard the usual meaning of "prescribing" and adjudicate their petition. *First*, they emphasize that ambiguities in statutes providing for direct court of appeals review of agency action should not be construed against such review. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 745 (1985). That argument fails because the tire industry petitioners have not identified any ambiguity in Section 30161(a). The jurisdictional statute is "not ambiguous in any sense relevant here; and this court simply is not at liberty to displace, or to improve upon, the jurisdictional choices of Congress." *Five Flags Pipe Line Co. v. Dep't of Transp.*, 854 F.2d 1438, 1441 (D.C. Cir. 1988). The absence of any relevant ambiguity likewise closes the door on the tire industry petitioners' subsidiary argument, based on the wording of an earlier version of the statute and on legislative history, that Congress intended direct court of

appeals review in this kind of case. "The best evidence of [the statutory] purpose is the statutory text adopted by both Houses of Congress and submitted to the President," which means the legislative history and earlier statutory language cannot trump the current statute's plain import here. *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991).

*Second*, the tire industry petitioners urge us to take jurisdiction under the All Writs Act. *See* 28 U.S.C. § 1651(a) ("[A]ll courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."). The All Writs Act empowers this Court "to compel agency action unreasonably withheld or delayed if the putative agency action, once forthcoming, would be reviewable in this Court." *Int'l Union, United Mine Workers v. Dep't of Labor*, 358 F.3d 40, 42 (D.C. Cir. 2004); *see Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 75 (D.C. Cir. 1984) ("*TRAC*"). In the past, we have drawn on the All Writs Act to protect our jurisdiction when agency conduct could plausibly make later merits review impossible. We have prevented an agency from interfering with appellate jurisdiction by unreasonably delaying a final decision or withdrawing a rule previously proposed. *See Mine Workers*, 358 F.3d at 43; *TRAC*, 750 F.2d at 76.

This case does not call on us to exercise that kind of authority. It involves neither unreasonable delay in responding to the rulemaking petition nor a withdrawn rule. More to the point, in declining to initiate the rulemaking, NHTSA in no way interfered with our jurisdiction. On the contrary, when no direct-review statute applies, parties aggrieved by Executive agency denials of petitions for rulemaking have routinely gone first to district courts, and then taken appeals from final district court judgments; that

practice obviously does not thwart appellate jurisdiction. *See, e.g.*, *Coll. Sports Council v. Dep't of Educ.*, 465 F.3d 20, 22-23 (D.C. Cir. 2006) (remanding for district court to consider challenge to denial of rulemaking petition); *Doris Day Animal League v. Veneman*, 315 F.3d 297, 297-98, 301 (D.C. Cir. 2003) (reversing district court's judgment concerning agency's denial of rulemaking petition). Thus, exercising jurisdiction under the All Writs Act is not appropriate in this case.

*Third*, the tire industry petitioners contend that the petition for rulemaking concerning Standard 110 raised issues so closely related to the Standard 138 rulemaking that we must resolve the former when resolving the latter. We have discretion to exercise so-called pendent appellate jurisdiction of this kind "sparingly" and "only when substantial considerations of fairness or efficiency demand it." *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1133-34 (D.C. Cir. 2004) (internal quotation marks omitted). Discretionary considerations of "fairness or efficiency" do not authorize us, however, to disregard plain statutory terms assigning a different court initial subject-matter jurisdiction over a suit. Again, we are "not at liberty to displace, or to improve upon, the jurisdictional choices of Congress." *Five Flags*, 854 F.2d at 1441.

For those reasons, we lack subject-matter jurisdiction over the tire industry petitioners' petition for review of NHTSA's refusal to initiate rulemaking concerning Standard 110.

III

The tire industry petitioners and Public Citizen have petitioned for review of Standard 138. The essence of the

challenge on the merits is that NHTSA's new safety regulation will improve tire safety, but not as much as the TREAD Act requires. Claims that a safety regulation is good – but not good enough – can pose difficult issues of standing. This case is no exception.

A

The Constitution limits the federal courts to deciding cases or controversies. *See* U.S. CONST. art. III, § 2, cl. 1; *DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1860-61 (2006). To present a justiciable case or controversy, litigants must demonstrate standing, among other requirements. As the Supreme Court has stated, "the law of Art[icle] III standing is built on a single basic idea – the idea of separation of powers." *Allen v. Wright*, 468 U.S. 737, 752 (1984). The standing doctrine helps ensure that the Judicial Branch does not perform functions assigned to the Legislative or Executive Branch and "that the judiciary is the proper branch of government to hear the dispute." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc).

To demonstrate standing under Article III, a party must show injury in fact that was caused by the conduct of the defendants and that can be redressed by judicial relief. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The "party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561. Under our precedents, "a petitioner whose standing is not self-evident should establish its standing by the submission of its arguments and any affidavits or other evidence appurtenant thereto at the first appropriate point in the review proceeding." *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) (punctuation altered). In a direct-review agency case in this Court, that "first appropriate point" is when the

petitioner files its opening brief. *Id.* Because petitioners bear the burden of proof on standing, they "must either identify . . . record evidence sufficient to support [their] standing to seek review or, if there is none because standing was not an issue before the agency, submit additional evidence to the court of appeals." *Id.* at 899; *see also* D.C. Cir. R. 28(a)(7) (citing *id.* at 900-01). When evaluating such evidence concerning standing, we "assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003).

Some petitioners in this case are organizations. An organization has standing to sue on behalf of its members when, among other things, "its members would otherwise have standing to sue in their own right." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Accordingly, an organization must show, based on the administrative record or other evidence (such as affidavits filed in court), that at least one member has suffered injury in fact. *See, e.g.*, *Sierra Club*, 292 F.3d at 899-900, 902.

The Supreme Court has stated that standing is "substantially more difficult to establish" where, as here, the parties invoking federal jurisdiction are not "the object of the government action or inaction" they challenge. *Lujan*, 504 U.S. at 562 (internal quotation marks omitted). In this case, the automakers – not the tire industry petitioners or Public Citizen – are the "object" of the regulation. The automakers are not challenging the regulation, however.

Along with their opening brief, petitioners filed numerous affidavits supporting standing. In its brief as respondent, NHTSA did not contest standing – which suggests that the agency believed standing was either self-evident from the administrative record or established by the

affidavits. But the intervenor automakers' association forcefully challenged petitioners' standing, and in any event, we have an independent constitutional obligation to consider it. *See DaimlerChrysler*, 126 S. Ct. at 1860-61.

B

The tire industry petitioners (four individual tire manufacturers and a trade association) offer affidavits asserting that people involved in accidents attributable at least in part to tire under-inflation invariably file products liability suits against tire manufacturers, seek refunds under tire warranties, or do both. Their theory can be boiled down to this: NHTSA's alleged under-regulation of the automakers will lead to more accidents than otherwise would occur, and the drivers and passengers injured in those accidents will bring warranty claims and suits not just against the automakers but also against the tire industry petitioners. This theory of causation takes a novel and unusually speculative view of the potential consequences that, for constitutional standing purposes, could fairly be traced to NHTSA's issuance of Standard 138. Not surprisingly, the tire industry petitioners have identified no case that has found standing based on such an attenuated causation chain. And we reject the tire industry petitioners' standing argument for a combination of three related reasons.

*First*, Standard 138 prescribes the conduct of *automakers*, not *tiremakers*. Tire pressure monitors are manufactured by automakers, not by tiremakers. The tire industry petitioners are demanding more intensive NHTSA regulation of the automakers to head off hypothetical litigation and warranty disputes between the tire industry petitioners and the car-riding public. There is an obvious causal disconnect, however, between the regulation of

automakers and private claims against tire industry petitioners. The tire industry petitioners have cited to us no precedents recognizing standing where, as here, the manufacturers of one product argue that manufacturers of another product should be more heavily regulated so as to prevent claims against manufacturers of the first product.

*Second*, Standard 138 sets a *minimum* performance standard for tire pressure monitors. The monitors will help detect significantly under-inflated tires – but tire industry petitioners can help prevent tires from becoming significantly under-inflated in the first place by manufacturing and marketing tires less prone to leaks or punctures, and by better educating drivers about tire inflation. In setting a floor (not a ceiling) for tire pressure monitors, NHTSA in no way prevented the tire industry petitioners from more effectively solving the tire under-inflation problem. Therefore, the tire industry petitioners' claim has at least some of the hallmarks of a "self-inflicted" injury not caused by the agency action. *Cf. Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) (noting that self-inflicted harm cannot support standing either because there is no injury in fact or because causation fails).

*Third*, no evidence supports the tire industry petitioners' theory that drivers and passengers injured in inflation-related accidents will bring successful warranty claims and products liability suits against the tire industry petitioners. Of course, the tumult over Firestone's recall of tires for Ford sport utility vehicles indicated that tire-related accidents and litigation may sometimes go hand-in-hand. *See, e.g.*, *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1014 (7th Cir. 2002). But that litigation is not on point, because it involved allegations that the tires themselves were defective. *See, e.g.*, *id.* at 1016. The tire industry petitioners here have not

explained how Standard 138 will lead drivers and passengers to bring successful warranty claims and products liability suits against them. Standard 138 does not seem to bear, moreover, on any legal claim or defense that might be presented in those hypothetical suits – unlike the situation in cases such as *International Fabricare Institute v. EPA*, 972 F.2d 384, 387, 390 (D.C. Cir. 1992).

To reiterate, the tire industry petitioners have cited no precedents supporting standing for this kind of claim. We conclude that the tire industry petitioners lack standing because the "links in the chain of causation between the challenged Government conduct and the asserted injury are far too weak." *Allen v. Wright*, 468 U.S. 737, 759 (1984); *see also Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663, 666 (D.C. Cir. 1996) (en banc) (petitioners must demonstrate "substantial probability" that agency action caused harm).

C

We next address Public Citizen's standing. Public Citizen submitted an affidavit from Joan Claybrook, the organization's president. She asserted that Standard 138 as adopted would affect Public Citizen's 130,000 members – who drive or ride in cars – by creating "a higher risk of injury" than if NHTSA adopted the alternative regulation that Public Citizen advanced. *See* Claybrook Aff. ¶ 2. In other words, because of NHTSA's rule, some Public Citizen members allegedly will suffer car accidents in the future that otherwise would be prevented. Because Public Citizen's "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*" – namely of the automakers – Public Citizen's standing in this case is "not precluded" but is "substantially more difficult to establish." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562

(1992) (internal quotation marks omitted).

Stated broadly, the issue posed by Public Citizen's submission is this: To reduce the risk of harm from using a product, when do consumers have standing to sue an executive agency to compel it to impose greater regulation on the product's manufacturers? Such a question raises delicate separation of powers concerns, and requires that the Judiciary ensure, in particular, that the plaintiff before the court has suffered a genuine injury in fact. The Supreme Court has cautioned that the federal courts "were simply not constituted as ombudsmen of the general welfare," *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 (1982), and are not "continuing monitors of the wisdom and soundness of Executive action," *Allen v. Wright*, 468 U.S. 737, 760 (1984) (internal quotation marks omitted). The Court therefore has insisted "upon meaningful limitations on what constitutes injury for standing purposes" because of "the key role that injury plays in restricting the courts to their proper function in a limited and separated government." John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 DUKE L.J. 1219, 1224 (1993).

Injury in fact is the "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks, citations, and footnote omitted). The Supreme Court has "emphasized repeatedly" that the alleged injury "must be concrete in both a qualitative and temporal sense. The complainant must allege an injury to himself that is distinct and palpable, as opposed to merely abstract, and the alleged harm must be actual or imminent, not conjectural or hypothetical." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (internal quotation marks, citations and

alteration omitted).

We evaluate Public Citizen's claim under the three requirements of injury-in-fact as the Court in *Lujan* articulated them – namely, the requirements that the asserted injury be (1) concrete, (2) particularized, and (3) actual or imminent.

1.  The Supreme Court has stated that the asserted injury must be concrete – which the Court has also described as direct, real, and palpable – not abstract. *See, e.g.*, *Lujan*, 504 U.S. at 560 ("concrete"); *Whitmore*, 495 U.S. at 155 ("palpable, as opposed to merely abstract"); *Allen*, 468 U.S. at 751 ("palpable"); *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) ("real"); *Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("palpable"); *United States v. Richardson*, 418 U.S. 166, 180 (1974) ("a direct injury"); (internal quotation marks, citations, and alterations omitted in above quotations).  In this case, the concreteness of the asserted injury is evident: Injuries from car accidents – including death, physical injuries, and property damage – are plainly concrete harms under the Supreme Court's precedents.

2.  The Supreme Court also has stated that the asserted injury must be particularized – which the Court has also described as personal, individual, distinct, and differentiated – not generalized or undifferentiated. *See, e.g.*, *Lujan*, 504 U.S. at 560 n.1 ("By particularized, we mean that the injury must affect the plaintiff in a personal and individual way."); *DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1861 (2006) ("personal"); *Whitmore*, 495 U.S. at 155 ("distinct"); *Allen*, 468 U.S. at 751 ("personal"); *Valley Forge*, 454 U.S. at 472 (litigant must show "he personally has suffered some actual or threatened injury"); *Richardson*, 418 U.S. at 177 (not "undifferentiated"); (internal quotation marks, citations, and

alterations omitted in above quotations).

Injuries from car accidents are particularized – each person who is in an accident is harmed personally and distinctly. The Supreme Court has made clear, moreover, that the fact that a number of people could be similarly injured does not render the claim an impermissible generalized grievance: "where a harm is concrete, though widely shared, the Court has found injury in fact." *FEC v. Akins*, 524 U.S. 11, 24 (1998) (internal quotation marks omitted); *see Lujan*, 504 U.S. at 581 (Kennedy, J., concurring in part and concurring in judgment) ("While it does not matter how many persons have been injured by the challenged action, the party bringing suit must show that the action injures him in a concrete and personal way."); *see also Massachusetts v. EPA*, 127 S. Ct. 1438, 1459 n.24 (2007) ("[S]tanding is not to be denied simply because many people suffer the same injury.") (internal quotation marks omitted).

Even those Justices who have embraced a more robust view of constitutional standing requirements have not equated an injury suffered by a number of people to an impermissible generalized grievance. For example, a mass tort inflicts "widely shared" injury, and each victim "suffers a particularized and differentiated harm. One tort victim suffers a burnt leg, another a burnt arm – or even if both suffer burnt arms they are *different* arms. . . . With the generalized grievance, on the other hand, the injury or deprivation is not only widely shared but it is *undifferentiated*." *Akins*, 524 U.S. at 35 (Scalia, J., dissenting); *see also Lujan*, 504 U.S. at 572 (Scalia, J., opinion for the Court) (no generalized grievance when "concrete injury has been suffered by many persons, as in mass fraud or mass tort situations").

Under the view of generalized grievances articulated in

*Akins*, and even under the position advanced in the *Akins* dissent, injuries from car accidents are particularized and differentiated; they are not impermissible generalized grievances.[1]

3.  The Supreme Court has further stated that the asserted injury must be actual or imminent – which the Court has also described as certainly impending and immediate – not remote, speculative, conjectural, or hypothetical.  *See Lujan*, 504 U.S. at 560 ("actual or imminent"); *DaimlerChrysler*, 126 S. Ct. at 1863 ("certainly impending"); *Whitmore*, 495 U.S. at 155 ("not conjectural or hypothetical"); *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (opinion of Kennedy, J., joined by Rehnquist, C.J., and Stevens and Scalia, JJ.) (not "remote or speculative"); *Lyons*, 461 U.S. at 102 ("immediate"); (internal quotation marks, citations, and alterations omitted in above quotations).

In this case, Public Citizen is not claiming that any of its members has actually been in a car accident that NHTSA's rule allegedly failed to prevent.  Rather, Public Citizen has alleged an increased risk of death, physical injury, or property damage from *future car accidents* that it says NHTSA's rule

---

[1] The rule against generalized grievances comes into play, the Supreme Court has stated, "where the harm at issue is not only widely shared, but is also of an abstract and indefinite nature – for example, harm to the common concern for obedience to law." *Akins*, 524 U.S. at 23 (internal quotation marks omitted); *see also Allen*, 468 U.S. at 754 ("asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction").  In that kind of case, "[t]he abstract nature of the harm – for example, injury to the interest in seeing that the law is obeyed – deprives the case of the concrete specificity" necessary for justiciability. *Akins*, 524 U.S. at 24.

will fail to prevent. In particular, Public Citizen claims that several hundred Americans, including some Public Citizen members, will annually be injured in car crashes who would not be injured if NHTSA complied with the TREAD Act. The "imminence" problem arises because no one can say who those several hundred individuals are out of the 300 million people in the United States, nor can anyone say when such accidents might occur. For any particular individual, the odds of such an accident occurring are extremely remote and speculative, and the time (if ever) when any such accident would occur is entirely uncertain.

As a result, there is a powerful argument that "increased-risk-of-harm" claims – such as Public Citizen's claim here – fail to meet the constitutional requirement that a plaintiff demonstrate harm that is "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes – that the injury is certainly impending." *Id.* at 565 n.2 (internal quotation marks omitted). In *Whitmore*, the Supreme Court summarized its case law and flatly stated: "[W]e have said many times before and reiterate today: *Allegations of possible future injury do not satisfy the requirements of Art[icle] III. A threatened injury must be certainly impending to constitute injury in fact.*" 495 U.S. at 158 (internal quotation marks omitted; emphasis added).[2]

---

[2] In *Massachusetts v. EPA*, the Supreme Court held that states receive "special solicitude" in standing analysis, including analysis of imminence. *See* 127 S. Ct. at 1454-55. No state is involved in this case, however.

Public Citizen's injury-in-fact theory flouts these settled principles. Public Citizen is attempting to assert remote and speculative claims of possible future harm to its members. Allowing a party to assert such remote and speculative claims to obtain federal court jurisdiction threatens, however, to eviscerate the Supreme Court's standing doctrine. As we have previously stated: "Were all purely speculative increased risks deemed injurious, the entire requirement of actual or imminent injury would be rendered moot, because all hypothesized, nonimminent injuries could be dressed up as increased risk of future injury." *NRDC v. EPA*, 464 F.3d 1, 6 (D.C. Cir. 2006) (quoting *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005)) (internal quotation marks and alteration omitted). We therefore have "cautioned that this category of injury may be too expansive." *Id*; *cf.* Cass R. Sunstein, *What's Standing After* Lujan*? Of Citizen Suits, "Injuries," and Article III*, 91 MICH. L. REV. 163, 228 (1992) (under Supreme Court's precedents, there "may be serious standing problems" in cases involving consumer safety challenges based on increased risk).

Nor does it help Public Citizen to aggregate a series of remote and speculative claims. As Justice Kennedy has explained, in terms critically important to increased-risk cases brought by organizations, "the doctrine of standing to sue is not a kind of gaming device that can be surmounted merely by aggregating the allegations of different kinds of plaintiffs, each of whom may have claims that are remote or speculative taken by themselves." *ASARCO*, 490 U.S. at 615 (opinion of Kennedy, J., joined by Rehnquist, C.J., and Stevens and Scalia, JJ.). Along the same lines, the Supreme Court has stated that the "law of averages is not a substitute for standing." *Valley Forge*, 454 U.S. at 489. Under the Supreme Court's precedents, it therefore does Public Citizen no good to string together 130,000 remote and speculative

claims rather than one remote and speculative claim. Each claim is still remote and speculative, which under the Supreme Court's precedents is an impermissible basis for our exercising the judicial power.

The consequences of allowing standing in these kinds of increased-risk cases are perhaps obvious, but worth explicating. Much government regulation slightly increases a citizen's risk of injury – or insufficiently decreases the risk compared to what some citizens might prefer. Under Public Citizen's theory of probabilistic injury, after an agency takes virtually *any* action, virtually *any* citizen – because of a fractional chance of benefit from alternative action – would have standing to obtain judicial review of the agency's choice. Opening the courthouse to these kinds of increased-risk claims would drain the "actual or imminent" requirement of meaning in cases involving consumer challenges to an agency's regulation (or lack of regulation); would expand the "proper – and properly limited" – constitutional role of the Judicial Branch beyond deciding actual cases or controversies; and would entail the Judiciary exercising some part of the Executive's responsibility to take care that the law be faithfully executed. *DaimlerChrysler*, 126 S. Ct. at 1860 (internal quotation marks omitted); *see Lujan*, 504 U.S. at 577; *Allen*, 468 U.S. at 761.

Contrary to Public Citizen's far-reaching theory, the Supreme Court's precedents establish that injuries from a car accident become actual or imminent only when the accident has occurred or is "certainly impending" and "immediate." When harm actually happens, state tort law may provide an avenue to recover damages from a party unreasonably causing the harm (for example, from the automaker). To avoid the standing problem of increased-risk cases, moreover, Congress also can presumably create a private cause of action enabling

consumers to sue private defendants such as automakers, for example, and obtain recovery for injuries *actually suffered* in car accidents as a result of federal statutory or regulatory violations by the automakers. *Cf. Lujan*, 504 U.S. at 578; *id.* at 580 (Kennedy, J., concurring in part and concurring in judgment). To the extent Congress is concerned about Executive under-regulation or under-enforcement of statutes, it also may exercise its oversight role and power of the purse. *See Laird v. Tatum*, 408 U.S. 1, 15 (1972). But all of that is far afield from allowing a consumer to sue an agency based solely on an event that, for any given individual, is extremely unlikely to occur and is not "imminent," "certainly impending," and "immediate." The Supreme Court has repeatedly held that disputes about future events where the possibility of harm to any given individual is remote and speculative are properly left to the policymaking Branches, not the Article III courts.

4. To be sure, this Court has not closed the door to all increased-risk-of-harm cases. We have allowed standing when there was at least *both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account. *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234-35 (D.C. Cir. 1996); *see also NRDC*, 464 F.3d at 6-7.

*Mountain States* arose in the context of environmental harm to individuals in a specific geographic area. *See Ctr. for Law & Educ.*, 396 F.3d at 1161 ("Outside of increased exposure to environmental harms, hypothesized 'increased risk' has never been deemed sufficient 'injury.'"). As we read *Mountain States* and as we analyzed it in *NRDC*, however, the *Mountain States* case applies here.

What increase in the risk of harm and what level of

ultimate risk are high enough to be "substantial" – and thus to render the harm sufficiently "imminent"? *Mountain States* did not specify any hard-and-fast numerical rules; we have simply set forth a general principle: If the agency action causes an individual or individual members of an organization to face an increase in the risk of harm that is "substantial," and the ultimate risk of harm also is "substantial," then the individual or organization has demonstrated an injury in fact. *See Mountain States*, 92 F.3d at 1235; *see also NRDC*, 464 F.3d at 6-7.

In applying the "substantial" standard, we are mindful, of course, that the constitutional requirement of imminence as articulated by the Supreme Court – even if this Court has said it does not completely bar increased-risk-of-harm claims – necessarily compels a very strict understanding of what increases in risk and overall risk levels can count as "substantial."

We turn to the record before us. Although Standard 138 furnishes drivers with a tire pressure monitor that is designed to reduce the risk of accidents from the status quo, Public Citizen contends that the TREAD Act required NHTSA to reduce the risk even further. Petitioners challenge Standard 138's: (i) definition of significant under-inflation and the failure to require a tire pressure reserve; (ii) failure to require monitors compatible with all replacement tires; (iii) 20-minute lapse before the warning light turns on; and (iv) testing methods. For purposes of standing, we must assume Public Citizen is correct when it alleges that the TREAD Act required the agency to go further with respect to those aspects of Standard 138. *See City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003).

In its briefs, Public Citizen set forth an estimate of the

number of injuries that its interpretation of the statutory term "significantly under inflated" would allegedly prevent, as compared to NHTSA's rule. But those figures are neither contained in the administrative record nor explained in an expert affidavit accompanying the opening brief. *Cf. Mountain States*, 92 F.3d at 1234-35 (administrative record); *NRDC*, 464 F.3d at 6-7 (expert affidavit). Moreover, the record does not contain any estimates of how many accidents would be avoided by adopting petitioners' interpretation of the TREAD Act with respect to any of the other challenged aspects of Standard 138, such as with respect to replacement tires and the 20-minute delay. In short, the record is incomplete.

This Court "retains the discretion to seek supplemental submissions from the parties if it decides that more information is necessary to determine whether petitioners, in fact, have standing." *Am. Library Ass'n v. FCC*, 401 F.3d 489, 494 (D.C. Cir. 2005); *see, e.g.*, *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 815 (D.C. Cir. 2006) ("[W]e raised the issue of standing at oral argument and requested supplemental briefing."); *Action on Smoking & Health v. Dep't of Labor*, 100 F.3d 991, 992 (D.C. Cir. 1996) (petitioner "furnished post-argument affidavits at our request"); *see also Abigail Alliance for Better Access to Developmental Drugs v. Von Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006) (supplemental briefing sought where agency first challenged standing after panel opinion issued).

Were we deciding this case based solely on the Supreme Court's precedents, we would agree with the separate opinion's conclusion that Public Citizen has not demonstrated standing and that supplemental briefing therefore is not needed. In light of *Mountain States* and *NRDC*, however, we think it prudent here to first obtain further submissions

concerning Public Citizen's standing. *Cf. Am. Library Ass'n*, 401 F.3d at 496. Within two weeks of the issuance of this opinion, Public Citizen should file affidavits (and an accompanying brief not exceeding 6,000 words) addressing (i) whether Standard 138 as adopted creates a substantial increase in the risk of death, physical injury, or property loss over the interpretation of the TREAD Act that Public Citizen has advanced, and (ii) whether the ultimate risk of harm to which Public Citizen's members are exposed, including the increase allegedly due to NHTSA's action, is "substantial" and sufficient "to take a suit out of the category of the hypothetical." *NRDC*, 464 F.3d at 6 (internal quotation marks omitted); *Mountain States*, 92 F.3d at 1235 (internal quotation marks omitted). NHTSA and the automakers' association as intervenor should file any affidavits (and briefs not exceeding 6,000 words each) addressing Public Citizen's Article III standing within two weeks after Public Citizen's filing.[3]

------

[3] In their submissions, the parties should also address the causation requirement. To begin with, we reject the automakers' contention that drivers can avoid the risk of accidents by checking tire pressure themselves, making Public Citizen's asserted claim a so-called "self-inflicted" harm that is not caused by the challenged government regulation. *See Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006). We recognize that drivers who follow the owner's manual instructions and check their tire pressure every month may be able to prevent some tire pressure accidents that otherwise would occur. But even if diligent drivers ensure correct tire pressure for their own cars, they cannot guarantee that *other* drivers will be so careful. The injury alleged by Public Citizen is therefore not self-inflicted under our precedents. *See id.*

That said, because Public Citizen's "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*," Public Citizen must "adduce facts

5.  In addressing the question whether the asserted increased-risk-of-harm qualifies as an injury in fact, we have properly considered Public Citizen's asserted injury to be the injuries from car accidents – death, physical injury, and property damage.  Those are concrete and particularized injuries, and therefore the primary question for injury-in-fact purposes is whether such injuries are imminent for a Public Citizen member.

It has been suggested, however, that another way to consider this issue is to say the "increased risk" is *itself* concrete, particularized, and *actual* injury for standing purposes.  *Cf.* Sunstein, *What's Standing After* Lujan*?*, 91 MICH. L. REV. at 228 (discussing possibility of characterizing injury as "a greater risk" rather than "an actual incidence" of harm).  But we reject that conception of the injury in fact for multiple reasons.  First, the mere increased risk of some event occurring is utterly abstract – not concrete, direct, real, and

---

showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562.  In this case, petitioners must show that causation does not "'depend[] on the unfettered choices made by *independent actors* not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'"  *Id.* (quoting *ASARCO*, 490 U.S. at 615 (opinion of Kennedy, J.)) (emphasis added).  Petitioners thus must demonstrate a "substantial probability," *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663, 666 (D.C. Cir. 1996) (en banc) (internal quotation marks omitted), that (i) automakers would not adopt safety standards more stringent than the minimum specified in the NHTSA regulation, (ii) consumers on their own would not check their tires so as to prevent injuries to others, and (iii) consumers would pay attention to the warning lights. *Cf. Bennett v. Spear*, 520 U.S. 154, 168-69 (1997); *NRDC*, 464 F.3d at 7; *Tozzi v. Dep't of Health & Human Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001).

30

palpable. *Cf. Lance v. Coffman*, 127 S. Ct. 1194, 1197-98 (2007) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220 (1974)). Second, increased risk falls on a population in an undifferentiated and generalized manner; everyone in the relevant population is hit with the same dose of risk, so there is no particularization. By contrast, the ultimate injuries themselves (such as the injuries sustained in car accidents) are particularized and differentiated. *Cf. Richardson*, 418 U.S. at 177 (rejecting asserted injury "plainly undifferentiated and common to all members of the public") (internal quotation marks omitted); Cass R. Sunstein, *Standing and the Privatization of Public Law*, 88 COLUM. L. REV. 1432, 1467-68 (1988) (standing based on increased risk of harm should be denied when injury asserted is "so generalized or diffuse that all or almost all citizens are affected in the same way"). Third, the Supreme Court has said that, in temporal terms, there are three kinds of harm – actual harms, imminent harms, and potential future harms that are not imminent. *See Whitmore*, 495 U.S. at 155. Treating the increased risk of future harm as an actual harm, however, would eliminate these categories. Under this approach, possible future injuries, whether or not they are imminent, would magically become concrete, particularized, and actual injuries merely because they *could* occur. That makes no sense, except as a creative way to end-run the Supreme Court's standing precedents. We decline to circumvent well-established standing law in this fashion. As we have said before, were "all purely speculative increased risks deemed injurious, the entire requirement of actual or imminent injury would be rendered moot, because all hypothesized, nonimminent injuries could be dressed up as increased risk of future injury." *NRDC*, 464 F.3d at 6 (quoting *Ctr. for Law & Educ.*, 396 F.3d at 1161) (internal quotation marks and punctuation omitted).

In sum, the proper way to analyze an increased-risk-of-harm claim is to consider the ultimate alleged harm – such as death, physical injury, or property damage from car accidents – as the concrete and particularized injury and then to determine whether the increased risk of such harm makes injury to an individual citizen sufficiently "imminent" for standing purposes.

## IV

NHTSA's refusal to initiate a rulemaking regarding Standard 110 is not an order directly reviewable in this Court under 49 U.S.C. § 30161(a), so we dismiss the petition concerning Standard 110 for lack of subject-matter jurisdiction. As for Standard 138: The tire industry petitioners have failed to demonstrate a causal connection between their alleged injury and the adoption of Standard 138, so they lack standing, and we dismiss their petitions. Additional information is necessary to decide whether Public Citizen has standing. We postpone a decision on its petition pending the filing of supplemental submissions as outlined in this opinion.

*So ordered.*

SENTELLE, *Circuit Judge*, *concurring in part and dissenting in part*: I fully agree with most of the court's opinion. As the majority's cogent analysis demonstrates, "we lack subject-matter jurisdiction over the tire industry petitioners' petition for review of the NHTSA's refusal to initiate rulemaking concerning Standard 110." Further, the analysis set forth in Part IIIB of the majority's opinion correctly demonstrates that the tire industry petitioners lack standing to bring this petition for review of standard 138. Also, I am in general agreement with the majority's thorough analysis of the standing of Public Citizen. I retain misgivings as to whether an organizational plaintiff can establish probabilistic standing based on increased risk where the increase in risk is no different from the increase suffered by the public at large. In my view, such an increased risk falls within the category of oversight reserved for the legislative branch described by the majority in its discussion of *Laird v. Tatum*, 408 U.S. 1, 15 (1972) (Maj. Op. at 25.). Perhaps in part because I retain this misgiving, I do not join the majority's decision to allow Public Citizen a further attempt to establish standing.

It is true that in *American Library Association v. FCC*, 401 F.3d 489 (D.C. Cir. 2005), we allowed such a second bite at the standing apple. While that case establishes circuit law for the authority of the court to allow such an attempt, it certainly does not mandate that we do so. As I did in that case:

> I therefore would find the governing precedent . . . in such cases as *America West Airlines, Inc. v. Burnley*, 838 F.2d 1343 (D.C. Cir. 1988), in which we have dismissed petitions of litigants who, after ample opportunity on the record before us, have not demonstrated standing.

*Id.* at 497 (Sentelle, J., dissenting).

Because Public Citizen has not demonstrated standing, we have no jurisdiction. I would dismiss their claim, along with that of the tire manufacturers. I therefore respectfully dissent from that portion of the majority's disposition.